UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br>　v.<br>EDWARD C. WRIGHT,<br><br>　　　　　　　　　Defendant. | Case No. 3:19-cr-00012-MMD-WGC-1<br><br>ORDER |

## I.　　SUMMARY

Defendant Edward C. Wright was indicted on two counts involving receiving and possessing child pornography. (ECF No. 1.) Defendant moves to suppress the evidence the government collected under a search warrant, primarily from his tablet ("Motion").[1] (ECF No. 20.) In a prior order, the Court granted Defendant's request for a *Franks*[2] hearing contained within his Motion (ECF No. 32), and the Court held that hearing on December 23, 2019 (the "Hearing") (ECF No. 41). As further explained below, the Court agrees with Defendant that Detective Laura Thomsen made intentional omissions in her application for a search warrant ("Warrant"), but otherwise disagrees with Defendant on the *Franks* issue because the Court finds the Warrant still would have issued if the omissions were added back in. Thus, the Court will not suppress any evidence based on Detective Thomsen's *Franks* violation. Further, the Court finds that Detective Thomsen and other unnamed investigators at the Washoe County Sheriff's Office ("WCSO")

---

[1]The government filed a response (ECF No. 25), and Defendant filed a reply (ECF No. 27).

[2]*Franks v. Delaware*, 438 U.S. 154 (1978).

violated Defendant's Fifth Amendment rights when they forcibly unlocked his smartphone—before they got a warrant—by holding it up to his face. Thus, the Court will suppress any evidence obtained from the smartphone. However, because this constitutional violation was not causally connected to the evidence discovered on Defendant's tablet, the Court declines to suppress the evidence collected on the tablet pursuant to the Warrant.

## II.     FINDINGS OF FACT[3]

The Court relies on documents filed by Defendant with his Motion, along with the testimony offered and exhibits admitted at the Hearing, to construct this factual background.

In 2018, Detective Thomsen began investigating Defendant for his failure to update his address as required of a registered sex offender. (ECF No. 25 at 2.) In February 2018, detectives also began investigating Defendant for sexually assaulting a four-year-old child. (*Id.*) Though he agreed to meet detectives for a polygraph in March 2018 in connection with the assault investigation, Defendant did not appear for the polygraph. (*Id.*) Detectives were unable to locate Defendant again until January 2019. At the time, Defendant was living with Timothy Bennett. (ECF No. 20 at 2.) Bennett called the police on January 28, 2019 to report that he discovered what he thought was child sexual abuse imagery on Defendant's tablet. (*Id.*) Bennet spoke with Detective Thomsen when he called. (*Id.*) After that conversation, Detective Thomsen interviewed Bennett twice. (*Id.*) Detective Thomsen recorded those interviews. (*Id.*)

In the interviews, Bennett explained how he came to know Defendant, how he let Defendant move in with him, and how he came to find what he thought was child sexual abuse imagery on Defendant's tablet. (ECF No. 20-1 at 6-7.) Bennett also described the

---

[3]*See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").

images he saw on the tablet on January 11, 2019. (*Id.* at 6.) Detective Thomsen noted all of this information both in her police report (*id.*), and in the affidavit ("Affidavit") she filed in support of her application for a search warrant ("Application") to search three electronic devices that belonged to Defendant—a smartphone and a smart watch in addition to the tablet (ECF No. 20-4 at 1-10). She also wrote in both documents that Bennett told her Defendant always had all three devices in his possession. (ECF Nos. 20-1 at 7, 20-4 at 9.) In addition, Detective Thomsen noted in her Affidavit that Defendant pleaded guilty to possession of child pornography in 2003, had missed a required sex offender registration, and was under investigation for the sexual assault of a child. (ECF No. 20-4 at 9-10.) She wrote that this history made it reasonable to believe that Bennett's tip as to the child sexual abuse imagery on Defendant's tablet was reliable. (*Id.* at 10.)

Detective Thomsen's Application was granted, resulting in the Warrant. (ECF No. 20-4 at 12-13.) The Warrant authorized law enforcement to make "a complete search within" Defendant's tablet, smartphone, and smart watch, "including any containers therein, whether locked or unlocked, which could reasonably contain the evidence to be searched for . . ." (*Id.* at 13.) After conducting a forensic examination of Defendant's electronic devices under the Warrant, Detective Thomsen's colleagues found 300 images of alleged child pornography on the tablet, but were unable to download anything from the smartphone or smart watch. (ECF No. 25 at 2.)

However, Detective Thomsen also learned other information from Bennett in the recorded interviews that she did not include in her Application. At the Hearing, Detective Thomsen repeatedly testified that she intentionally omitted the five items of information summarized below from her Application because she thought they were not relevant to the Application.[4] First, Bennett told Detective Thomsen that he is an ex-felon. (ECF No.

---

[4]The Court will collectively refer to these omissions as the "Five Omissions."

3

20 at 3.) Specifically, he was convicted of obtaining money by false pretenses and grand larceny in 2007—for stealing a mobile home, forging its title, and selling it to someone else for $20,000. (ECF No. 20-3.) Second, Bennett told Detective Thomsen he had the passwords to Defendant's electronic devices, and had accessed them when Defendant was not there on at least one occasion. (ECF No. 27 at 7.) Third, Bennett told Detective Thomsen that he wanted to see Defendant arrested. (*Id.*) Fourth, Bennett told Detective Thomsen that he had, referring to Defendant, "choked that son-of-a-bitch halfway to death," when Defendant showed up at Bennett's apartment drunk, and Bennett's son had to pull Bennett off Defendant to break up the altercation. (ECF No. 41.) Fifth, Bennett told Detective Thomsen that he had been letting Defendant stay with him in his studio apartment, and pay him rent money, even though Bennett was prohibited from doing so and could lose his subsidized housing if the relevant authorities found out. (*Id.*) As noted, Detective Thomsen did not include any of this in her Affidavit. (ECF No. 20-4.)

Detective Thomsen arrested Defendant at the Washoe County Senior Center for failing to register as a sex offender and took him to jail. (ECF No. 20 at 3; *see also* ECF No. 20-1 at 7.) Based on Detective Thomsen's testimony at the Hearing, the exchange in the interrogation room described below occurred shortly after she arrested Defendant, but before she submitted the Application—described above. Thus, the exchange described below occurred before she obtained the Warrant.

After moving Defendant to an interrogation room, accompanied by two other unidentified WCSO officers, Detective Thomsen told Defendant: "Obviously you are in custody. I'll just read you *Miranda* real quick . . . before I talk to you." (ECF No. 20 at 3.) She read Defendant a *Miranda* warning. (*Id.*) Detective Thomsen then asked Defendant, "Are you cool talking with me?" (*Id.*) Defendant responded, "I want an attorney." (*Id.* at 3-4.) Detective Thomsen confirmed his statement. (*Id.* at 4.)

After Defendant invoked his right to counsel, Detective Thomsen stopped asking him substantive questions. But on the recording of the interview, you can then hear male

voices—the other detectives—say, "I think he needs to take his glasses off," and then ask Defendant to take off his glasses. (ECF No. 20-5 at 1:29-1:41.) Several minutes later in the recording (*id.* at 6:34), you can hear the sound of his phone unlocking (ECF No. 20 at 4). Shortly thereafter, Detective Thomsen and the other detectives appear to have gotten what they were seeking, and end the recording (*id.* at 6:35-6:54). The government does not dispute any of this. (ECF No. 25.) The government concedes the officers in the interrogation room unlocked Defendant's smartphone by holding it up to his face. Similarly, the government does not dispute this occurred before Detective Thomsen got the Warrant.

## III. DISCUSSION

Defendant makes two main arguments in his Motion. The Court addresses both below—first the *Franks* argument, and then Defendant's arguments regarding the forcible unlocking of his phone using his face, which the Court refers to under the heading 'biometrics.'

### A. *Franks*

Defendant first argues suppression is warranted under *Franks*. (ECF No. 20 at 7-10.) This argument was the focus of the Hearing. In *Franks*, the Supreme Court established a two-prong test for overturning a judicial officer's probable cause finding. Under this test, as always, there is a "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S at 171. And here, as noted, the Court determined Defendant made a sufficient preliminary showing such that a *Franks* hearing was warranted (ECF No. 32), and held the Hearing. That brings the Court to the merits of Defendant's *Franks* challenge.

"To prevail on a *Franks* challenge, the defendant must establish two things by a preponderance of the evidence:" (1) "that the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant," and (2) "that the false or misleading statement or omission was material, *i.e.*, necessary to finding

5

probable cause." *U.S. v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (internal quotation marks, punctuation, and citation omitted). "If both requirements are met, the search warrant must be voided and the fruits of the search excluded[.]" *Id.* (internal quotation marks and citation omitted). Under the first *Franks* step, a "negligent or innocent mistake does not warrant suppression." *Id.* Under the second step of *Franks*, the "key inquiry is 'whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions.'" *Id.* at 1119 (citation omitted). "Probable cause to search a location exists if, based on the totality of the circumstances, there is a 'fair probability' that evidence of a crime may be found there." *Id.*

The Court begins with *Franks* step one. It is not a close call. Defendant has established by a preponderance of the evidence that Detective Thomsen intentionally omitted the Five Omissions from her Application. Indeed, Detective Thomsen testified at the Hearing that she intentionally omitted the Five Omissions from her Application because she determined they were not relevant to Bennett's credibility, at least in part because he was a reporting party and not someone himself under investigation, and seemingly in part because of her belief that what constitutes relevant information to include in her Application lies entirely within her discretion. Thus, Detective Thomsen's testimony at the Hearing establishes that Defendant prevails on *Franks* step one.

But the Court will not immediately move on to *Franks* step two because the Court found Detective Thomsen's testimony at the Hearing troubling. It seems to reflect a view of appropriate investigatory practices that defy both the law and common sense. At the most basic level, Detective Thomsen explained that she did not include the Five Omissions in her Application because she did not think they were relevant to Bennett's credibility.

Detective Thomsen is wrong. The credibility of the source of information—whether an informant or a citizen witness—is relevant because a judge is asked to consider that information in determining the existence of probable cause. Here, each of the Five

6

Omissions made it more probable that Bennett was lying—and thus they were relevant to his credibility. For example, the fact that Bennett disliked Defendant so strongly that he 'choked him halfway to death' is consistent with a view that Bennett called to report Defendant for suspected child pornography "about a month" after he found it because he wanted to be sure Defendant would be removed from Bennett's studio apartment, especially where Bennett was not allowed to have Defendant there and could lose his subsidized housing if the authorities found out. As Defendant's counsel pointed out at the Hearing, if Bennett felt so strongly about Defendant's possession of child pornography, why didn't Bennett contact police upon his discovery of it? Further, the fact that Bennett told Detective Thomsen he was a convicted felon, and she declined to even ask, 'what type of felony?' defies common sense—especially when she continued to insist that information was not relevant to Bennett's credibility at the Hearing—even after learning Bennett's felony convictions sounded in fraud. *See United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997) ("A known liar is less worthy of belief than an individual about whom nothing is known."). Detective Thomsen had information that suggested Bennett was lying and yet she insists that whether he lied was not relevant to the probable cause determination. Detective Thomsen's view of what was relevant to Bennett's credibility is simply wrong.

To the extent that view is based on a distinction between informants and tipsters—as the government argues—it is still wrong because that distinction is a distinction without a difference. The Court addressed and rejected this argument in its order granting Defendant a *Franks* hearing. (ECF No. 32 at 5.) But the government nevertheless noted its disagreement with the Court's prior ruling at the Hearing, and some of Detective Thomsen's testimony suggested she had been trained to think this informant/tipster distinction was meaningful. So the Court will briefly address this purported distinction again. To be clear, there is no such distinction. The government seeks to create a bright-line rule where none exists.

The government relies on a citation from *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) ("Shirk was a citizen witness, not an informant, and such witnesses are generally presumed reliable."), and *Ewing*'s citation to *United States v. Banks*, 539 F.2d 14, 17 (9th Cir.1976) ("A detailed eyewitness report of a crime is self-corroborating; it supplies its own indicia of reliability.") (discussing the reliability of an informant) in support of this purported distinction. (ECF No. 25 at 4.) But the government's precise citation to *Ewing* fatally undermines the government's argument that such a distinction exists because even that quotation says that citizen witnesses are *generally* presumed reliable—meaning not in every case, and depending on the circumstances. And here, Bennett was not an average citizen witness—he lived with Defendant, and called to report him for a suspected crime that occurred several weeks in the past, after Defendant apparently stopped paying rent and was bothering him. Bennett also told Detective Thomsen he was a felon, and told her about several crimes or violations of rules he had committed. The Court will not apply a general rule that does not fit the specific circumstances of this case to reach the result the government desires. Bennett was not a mere citizen witness. In addition, the Supreme Court rejected the sort of bright-line rule the government would like to exist in *Illinois v. Gates*, 462 U.S. 213, 232 (1983) ("probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."). Whether Bennett is considered an informant or a tipster—his credibility matters—and Detective Thomsen omitted everything she learned about him that would tend to undermine his credibility from her Application.

Moreover, Detective Thomsen's mistaken view of relevance highlights why her testimony was so troubling. She seemed to suggest that she was the ultimate arbiter of relevance, and was only required to pass on information she found relevant to the judge from whom she sought the Warrant. But that view makes her the judge, which contradicts her testimony to the effect she understands it is ultimately the judge's decision whether

8

probable cause exists to support the issuance of a search warrant. More importantly, it is wrong as a matter of law: "an affiant can mislead a magistrate by reporting less than the total story, thereby manipulating the inferences a magistrate will draw." *Perkins*, 850 F.3d at 1117-18. Indeed, the Five Omissions "reveal a clear, intentional pattern," where Detective Thomsen "selectively included information bolstering probable cause [in her Application], while omitting information that did not." *Id.* at 1117; *see also id.* at 1119 (overturning district court's finding at *Franks* step one that was favorable to the government). Without the Five Omissions, Detective Thomsen's Affidavit presents Bennett as someone who tried to help Defendant but then contacted the police upon learning that Defendant had images of child sexual abuse on Defendant's tablet. (ECF No. 20-4 at 7-9.) With the inclusion of the Five Omissions, a very different version of Bennett emerges, *see infra*—as someone with a prior felony going to his honesty and who had reasons for wanting Defendant to be arrested. When an officer applies for a search warrant, she must pass along all relevant information to the judge, particularly information that goes to the credibility of the only witness, so that she does not usurp the "magistrate's duty to conduct an independent evaluation of probable cause." *Id.* at 1118.

Having found for Defendant at *Franks* step one, the Court now turns to step two: "whether the affidavit, once corrected and supplemented, establishes probable cause." *Id.* at 1119 (citation and internal quotation marks omitted). And despite Detective Thomsen's troubling testimony, the Court finds that it would. The Court will therefore decline to suppress any evidence as a result of Defendant's *Franks* challenge.

At this step, the Court adds the Five Omissions to Detective Thomsen's Application and nonetheless determines that the Warrant should have issued. Once the Five Omissions are added back in, the Application paints a very different picture of Bennett as a less credible person. In short, he has suspect motives for reporting a crime he allegedly discovered weeks before he reported it, and a felony conviction tending to show untruthfulness. These factors undermine the issuing judges' probable cause finding, but

9

the judge still could have found Bennett sufficiently credible even with the Five Omissions added back in. *See Hall*, 113 F.3d at 160 (considering how a past criminal conviction suggesting untruthfulness undermines the credibility of a tipster); *United States v. Meling*, 47 F.3d 1546, 1555 (9th Cir. 1995) ("the fact that an informant has an ulterior or impure motive in coming forward to provide information to the police does not preclude a finding that the informant is nevertheless credible."). And as the government argued at the Hearing, Bennett gained some credibility by making incriminating admissions to Detective Thomsen. *See Hall*, 113 F.3d at 159 (finding that an only somewhat credible tipster "gained some credibility" by making incriminating statements to the police, but not enough to support a probable cause finding).

But more importantly, Detective Thomsen included enough other information in her Application untainted by Bennett that the issuing judge could have found probable cause to issue the Warrant despite Bennett's low level of credibility. First, the fact that Defendant previously pleaded guilty to possession of child pornography made it somewhat more likely that his electronic devices contained child pornography—because that is the same offense for which Detective Thomsen was seeking the search warrant. (ECF No. 20-4 at 6, 10.) *See also Perkins*, 850 F.3d at 1120-21 (stating that a prior conviction can contribute to a probable cause finding when it "involves a crime of the same general nature as the one the warrant is seeking to uncover," but cautioning that it is relevant "only to the extent it increases the likelihood that evidence of the suspected crime will be found," and ultimately finding that relatively stale past convictions for incest and child molestation did not increase the likelihood that the defendant possessed child pornography). This case is thus distinct from *Perkins*, in that Defendant has a prior conviction for the same offense Detective Thomsen suspected him of in her Application. Further, the Application was to search three electronic devices that Detective Thomsen understood were normally in Defendant's possession, and electronic devices can store child pornography, so Defendant's past conviction was relevant to her Application.

Bennett had also told Detective Thomsen he saw what he thought was child pornography on Defendant's tablet—and described the images in detail—and thus, in sum, Defendant's past conviction could contribute to a probable cause finding under these circumstances.

Second, Detective Thomsen included in her Application that she was investigating Defendant, and had arrested him, for his third offense of failure to register as a sex offender. (ECF No. 20-4 at 6-7, 10.) Third, she included in her Application that she was also involved in an investigation of Defendant for sexually assaulting a four-year-old child, where he had agreed to take a polygraph, never appeared for it, and then left the residence where he had been staying without updating his address. (*Id.* at 6.) These two sets of facts further support a probable cause finding. To start, these facts show that Bennett's call, while it came out of the blue, fit a pattern of related conduct for which Detective Thomsen was actively investigating Defendant, making it easier for her to draw the inference that Defendant's devices probably contained child sexual abuse imagery. These facts also suggest that Defendant was on the run from the authorities, suggesting that he had something to hide.

In sum, when the Court adds these three sets of facts to Bennett's report—after significantly discounting the credibility of that report by adding back in the Five Omissions—there is sufficient material in the Application to support a probable cause finding. *See, e.g.*, *Meling*, 47 F.3d at 1556 (finding that affidavit submitted in support of wiretap application contained sufficient facts to support a probable cause finding even after omissions were added back into it because the application contained substantial evidence beyond the testimony of a less-than-fully credible informant).

At the Hearing, Defendant pointed to *Hall*, 113 F.3d 157, as the case that most strongly supports his position. And *Hall* certainly supports Defendant's position—but is sufficiently distinguishable such that it does not compel a different outcome in this case. The key difference between this case and Hall is the corroborating evidence—the three

sets of facts discussed above—that made what Bennett told Detective Thomsen more likely to be true, and help to sustain a probable cause finding. In *Hall*, there was basically no evidence to corroborate what the informant with an undisclosed prior offense bearing on his truthfulness and a motive to lie told the judge who issued the warrant. *See* 113 F.3d at 161 ("The government presented no evidence to the magistrate to suggest a probability that Hall had narcotics in his trailer except the word of a man whom it knew had a substantial criminal record, including a conviction for making a false report to police."). *Hall* therefore does not drive the outcome of Defendant's Motion.

In sum, Defendant cannot meet the second *Franks* step because sufficient probable cause supports issuing the Warrant even after adding the Five Omissions to the information presented in the Application. Accordingly, the Court will not suppress any evidence based on Defendant's *Franks* challenge.

**B.     Biometrics**

Because it is unpersuaded on the *Franks* issue, the Court now addresses Defendant's other principal argument—that the warrantless, non-consensual harvesting of his biometric data warrants suppression because it was alternatively a Fourth or Fifth Amendment violation. (ECF No. 20 at 10-19.) Specifically, Defendant relatedly argues that the constitutional magnitude of this violation—unlocking Defendant's phone with his face after he invoked his right to counsel, without a warrant—means that the Court should suppress all evidence found on Defendant's tablet, even though the investigating detectives only forcibly unlocked his phone. (*Id.* at 19-20.) The government primarily responds that the biometrics issue is moot, because the government did not find any evidence on the smartphone. (ECF No. 25 at 5.) But the government alternatively argues on the merits that no Fourth or Fifth Amendment violation occurred warranting suppression. (*Id.* at 5-10.) The Court first addresses below the question of mootness, and then moves on to the substantive constitutional challenges.

///

12

### 1. **Mootness**

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (some internal quotation marks omitted).

Here, Defendant's biometrics argument is not moot because a justiciable 'controversy' remains. Specifically, Defendant argues that the constitutional violation as to the forcible facial unlocking of the smartphone creates a constitutional issue of such magnitude that it warrants suppression of all evidence collected pursuant to the Warrant—including the incriminating evidence found on Defendant's tablet that led to the indictment here—and not just the evidence on the smartphone. (ECF No. 20 at 19-20.) Because Defendant seeks wholesale suppression, this issue is not moot even though the government represented at the Hearing it would not seek to introduce any evidence found on the smartphone at trial.[5] The Court will therefore move on to the merits of Defendant's constitutional challenge.

---

[5] The government's argument in its response to the Motion was actually slightly different than its representation at the Hearing. The government wrote, "[a]s the detectives were unable to download from the cell phone (the only one of the devices that the biometric data was used in attempt to open the device), there is no evidence to suppress and as such, the defendant's motion to suppress any evidence from the phone is moot." (ECF No. 25 at 5.) But that would not moot this issue, because the government did not even represent it did not intend to introduce any evidence from the phone. And presumably the government could try to 'download' from the phone again before trial, which may yield other evidence the government would want to use. In general, while it is clear that if seized evidence was not introduced at trial, a motion seeking to suppress that evidence is moot, *see U.S. v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013) ("The record confirms the district court's conclusion that the seized evidence was not introduced at trial, thereby rendering the motion to suppress moot."); *U.S. v. Nieves-Cortez*, 401 F. App'x 263, 264 (9th Cir. 2010) (finding motion to suppress moot when government did not introduce seized evidence subject to the motion to suppress at trial); *U.S. v. Strange*,

13

## 2. Fifth Amendment

Defendant argues that the forcible extraction of his biometric data violated his Fifth Amendment rights because it is testimonial, as it reflects an implied assertion of facts—specifically, that he had sufficient control over the phone that he could unlock it with his face. (ECF No. 20 at 12-18.) The government concedes that the forcible unlock occurred, and was incriminating and compelled, but disputes that it was testimonial, because it is nothing more than the compelled display of identifiable physical characteristics—and thus no Fifth Amendment violation occurred. (ECF No. 25 at 7-9.) Defendant replies by reiterating that forcing someone to provide biometric data is testimonial because it reveals the contents of that person's mind, and points out that the government does not engage with the contemporary caselaw Defendant relies on in making his Fifth Amendment argument. [6] (ECF No. 27 at 9-11.)

While the Court agrees with Defendant that the government fails to engage with contemporary caselaw that directly addresses this biometrics issue,[7] the parties' arguments nonetheless generally map to a split in the recent district court decisions addressing this issue.[8] *Compare Matter of Residence in Oakland, California*, 354 F. Supp.

---

23 F. App'x 715, 717 (9th Cir. 2001) (same), a mootness argument like the government tried to make in its briefing is premature—because trial has not yet occurred.

[6] Because the Court is persuaded by Defendant's Fifth Amendment argument on the biometrics issue, the Court need not, and does not, reach Defendant's Fourth Amendment argument as to the same issue.

[7] In that respect, the government's approach in its briefing is inconsistent with the Supreme Court's preferred approach to new technologies. *See Carpenter v. United States*, 138 S. Ct. 2206, 2222 (2018) ("When confronting new concerns wrought by digital technology, this Court has been careful not to uncritically extend existing precedents.").

[8] The district court decisions addressing biometrics issues discussed in this section primarily arise in the context of applications for warrants to search devices that also specifically authorize compelled biometric unlocking. That implies that other police agencies are applying for warrants before using biometrics to forcibly unlock an electronic

3d 1010, 1015-16 (N.D. Cal. 2019) ("*Oakland House*"), *review dismissed as moot in light of revised warrant sub nom. In re Search of a Residence in Oakland, California*, Case No. 19MJ70053KAW1JD, 2019 WL 6716356 (N.D. Cal. Dec. 10, 2019) (finding that compelled production of biometric data was testimonial for Fifth Amendment purposes in the context of a warrant application seeking permission to compel fingerprint or facial recognition device unlocking); *In re Application for a Search Warrant*, 236 F. Supp. 3d 1066, 1073-74 (N.D. Ill. 2017) (same as to forced fingerprint device unlocking only); *United States v. Maffei*, Case No. 18-CR-00174-YGR-1, 2019 WL 1864712, at *6 (N.D. Cal. Apr. 25, 2019) (finding that forcing the defendant to provide "her cellphone passcode" was testimonial, but ultimately that it did not violate the Fifth Amendment because it was not compelled, though the district court still suppressed the defendant's statement of her passcode for violating her Fourth and Sixth Amendment rights) *with Matter of White Google Pixel 3 XL Cellphone in a Black Incipio Case*, 398 F. Supp. 3d 785, 793-94 (D. Idaho 2019) (finding that a forced application of a fingerprint to unlock a device was not testimonial for Fifth Amendment purposes); *Matter of Search of [Redacted] Washington, D.C.*, 317 F. Supp. 3d 523, 539 (D.D.C. 2018) (same); *Matter of Search Warrant Application for cellular telephone in United States v. Anthony Barrera*, --- F. Supp. 3d ----, Case No. 19 CR 439, 2019 WL 6253812, at *7 (N.D. Ill. Nov. 22, 2019) (concluding "that any implicit inference that can be drawn from a biometric unlock procedure is not of

---

device. In contrast, the facts of this case suggest that WCSO thinks it does not need a warrant at all.

Moreover, the Warrant in this case is both unclear and out-of-date. (ECF No. 20-4 at 12-13.) It appears to be written to address the search of a house, but applies to the search of digital devices—which are not the same. Thus, while it is undisputed the forced facial unlock occurred before Detective Thomsen got the Warrant, it would be very difficult to determine whether a forcible facial unlock would be within the scope of the Warrant were the chronology different—and the answer is likely no.

15

testimonial significance."). No judge in this District appears to have addressed the question.⁹

Among these cases, the Court finds the reasoning of *Oakland House*, 354 F. Supp. 3d at 1015-16, most persuasive. As the magistrate judge explained in *Oakland House*, there are two fundamental differences between using a biometric feature to unlock a device and submitting to fingerprinting or a DNA swab—the historical analogues discussed in cases upon which the government relies here. (ECF No. 25 at 7-9.) *See also Oakland House*, 354 F. Supp. 3d at 1015. First, a biometric feature is functionally the same as a passcode, and because telling a law enforcement officer your passcode would be testimonial, so too must the compelled use of your biometric feature to unlock a device. *See id.* at 1015-16. Second, unlocking a phone with your face equates to testimony that you have unlocked the phone before, and thus you have some level of control over the phone. *See id.* at 1016. And that second point is especially compelling in a prosecution for possession of child pornography, where possession is an essential element of the offense, and most especially if the government found child pornography on the phone forcibly unlocked—because that would be strong evidence the owner of the phone possessed the child pornography.

The Court therefore finds that WCSO detectives' unlocking of Defendant's phone with his face "infring[es] the Fifth Amendment's privilege against self-incrimination, [was] an abuse of power and is unconstitutional." *Oakland House*, 354 F. Supp. 3d at 1016. It violated Defendant's Fifth Amendment rights because the unlocking of the phone with Defendant's face was a testimonial act.

---

⁹The Court notes that the privacy interests at stake are significant because smartphones "are in fact minicomputers that also happen to have the capacity to be used as a telephone." *Riley v. California*, 573 U.S. 373, 393, (2014). And while this appears to be an issue of first impression in this District, the Court expects that this issue will come up more often in the future, assuming that biometric technologies continue to proliferate as preferred methods to access digital devices.

## C. Suppression Remedy

Having found a Fifth Amendment violation, the Court next determines the appropriate remedy for that violation. Defendant argues that the Court should suppress all evidence collected under the Warrant—even though the Fifth Amendment violation that accrued through the detectives' forcible harvesting of Defendant's biometric data only applies to the smartphone—because the circumstances of this violation are particularly troubling. (ECF No. 27 at 11-12.) Defendant specifically argues that here, law enforcement did something that they knew or should have known was unconstitutional, and then tried to cover it up. (*Id.* at 12.) Defendant therefore argues that wholesale suppression is warranted to send a message—to deter local law enforcement from unlocking people's phones using their faces without a warrant in the future.

In arguing for complete suppression here, Defendant relies on *U.S. v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992). But *Chen* applies to a different type of case, "where there is a 'flagrant disregard' for the terms of the warrant[;]" in such a case, "the district court may suppress all of the evidence, including evidence that was not tainted by the violation." *Id.* (citation omitted). Here, it is undisputed that the WCSO detectives unlocked Defendant's phone using his face before they even got a warrant. Thus, the question is not really whether they exceeded the scope of the Warrant in executing it. Moreover, the *Chen* court described the wholesale suppression remedy as an "extraordinary remedy" that "should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." *Id.* (citation omitted). Therefore, *Chen* does not exactly apply to this case, and suggests that wholesale suppression, even of evidence untainted by a constitutional violation, is an extraordinary remedy that should be sparingly deployed.

That said, there is no question that the exclusionary rule applies in cases where courts find violations of either the Fourth or Fifth Amendment. *See, e.g.*, *U.S. v. Dreyer*, 804 F.3d 1266, 1278-79 (9th Cir. 2015) ("The exclusionary rule is certainly available for

violations" of a defendant's Fourth or Fifth Amendment rights.) Thus, aside from Defendant's specific reliance on *Chen*, the Court finds Defendant's argument for wholesale suppression plausible—but not ultimately persuasive.

"The prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *U.S. v. Sears*, 411 F.3d 1124, 1128 (9th Cir. 2005) (quoting *Illinois v. Krull*, 480 U.S. 340, 347 (1987)) (internal quotation marks modified). "In the interest of deterrence, evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* (citation omitted). And the same analysis applies to this case, though the Court has specifically found a Fifth Amendment violation, and not Fourth Amendment violation like the violation at issue in *Sears*. *See Dreyer*, 804 F.3d 1266 at 1278-81 (explaining that the exclusionary rule operates similarly when Fourth and Fifth Amendment violations occur). Further, the Court notes the general rule that "[c]ourts do not invoke the exclusionary rule absent compelling circumstances[.]" *Id.* at 1278.

As an initial matter, to the extent the government seeks to introduce any evidence recovered from the smartphone at trial—though it has said it will not—it may not, because any evidence collected from the smartphone is hereby suppressed. *See, e.g.*, *United States v. Robbins*, Case No. 3:15-cr-00070-MMD-WGC, 2017 WL 187150, at *8-*9 (D. Nev. Jan. 17, 2017), *aff'd*, 723 F. App'x 471 (9th Cir. 2018) (suppressing evidence after finding a Fifth Amendment violation).

But the Court will decline to suppress any evidence collected from the tablet or smart watch because of the Fifth Amendment violation as to the smartphone. The constitutional violation as to the smartphone was not the but-for cause of the discovery of evidence on the tablet—the Warrant was. *See Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("but-for causality is only a necessary, not a sufficient, condition for suppression.").

18

In addition, as this question of forcible unlocking of a phone using a biometric identifier appears to be an issue of first impression in this District, and neither the Ninth Circuit nor the Supreme Court has directly spoken to the issue, the Court cannot say that the WCSO detectives who committed the Fifth Amendment violation as to the smartphone "may properly be charged with knowledge" that their actions were unconstitutional. *Sears*, 411 F.3d at 1128. Further, suppression—especially of evidence collected from a device not subject to the constitutional violation—must always be the Court's "last resort," and not its "first impulse." *Dreyer*, 804 F.3d at 1278 (citing *Hudson*, 547 U.S. at 591). And most importantly, based on the caselaw that Defendant relies on and the Court's own research, the Court would not be on firm legal ground were it to order suppression of the evidence collected from the tablet because of the Fifth Amendment violation as to the smartphone. Thus, the Court declines to order wholesale suppression here.

That said, WCSO "must conform its investigatory practices to the law," even though the Court in this case is giving WCSO "the opportunity to self-correct before [it] resort[s] to the exclusionary rule[.]" *Id.* at 1280. And going forward, "institutional confusion or ignorance [will not be] a ground for refusing to exclude evidence." *Id.* at 1281.

**IV. CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

///

///

///

///

///

///

19

It is therefore ordered that Defendant's motion to suppress (ECF No. 20) is granted in part, and denied in part. Any evidence collected from the smartphone is suppressed. However, the evidence collected from the tablet, and any evidence collected from the smart watch, is not suppressed.

DATED THIS 6th day of January 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE